UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG ISAACS, *et al*., ) | Case No. 12cv0381 L (BGS) |
| ) | |
| Plaintiffs, ) | **ORDER GRANTING/DENYING XMSJS [DOCS. 40, 42]** |
| ) | |
| v. ) | |
| ) | |
| CHARTIS SPECIALTY INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

  On February 2, 2012, Plaintiffs Craig Isaacs ("Isaacs") and Nexus Wealth Management, Inc. ("Nexus') commenced this action against Defendant Chartis Specialty Insurance Company ("Chartis").  This is an insurance coverage action which arises out of Chartis's alleged failure to fulfill its obligations under a professional liability insurance policy which names Plaintiffs as insured parties.  The parties have now filed cross-motions for summary judgment.

  The Court found this motion suitable for determination on the papers submitted and without oral argument.  (Doc. 50.); *See* Civ. L.R. 7.1(d.1). For the following reasons, the Court **GRANTS/DENIES** Defendant's/Plaintiffs' motion for summary judgment.

//

//

//

## I.    BACKGROUND

### A.    THE INSURANCE POLICY

This case arises from an insurance policy that Chartis issued to Geneos Wealth Management, Inc. ("Geneos"). This "Securities Broker/Dealer Professional Liability Insurance" Policy (the "Policy") was in effect from July 1, 2010 to July 1, 2011. (*Joint Statement of Undisputed Facts* [Doc. 42-2] ¶ 1.) Under the policy, Geneos is classified as a "Broker/Dealer" and an "Insured." (*Id.* ¶ 2.) Isaacs and Nexus are both classified as "Insured" and "Registered Representative[s]" under the policy. (*Id.* ¶¶ 3, 4.)

The policy provides, in relevant part, as follows:

### B. REGISTERED REPRESENTATIVE PROFESSIONAL LIABILITY INSURANCE

This policy shall pay on behalf of a Registered Representative Loss arising from a Claim first made against the Registered Representative during the Policy Period or the Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act committed by the Registered Representative in the rendering or failure to render Professional Services on behalf of the Broker/Dealer.

In the event a Registered Representative or Registered Representative Company is providing investment advisory services and such services involve a securities transaction that is to be completed through the Registered Representative or Registered Representative Company but not through the Broker/Dealer, coverage shall not be afforded by this policy for such activities unless prior to participating in such activities, the Registered Representative provides written notice to and receives approval from the Broker/Dealer.

In the event a Registered Representative or Registered Representative Company is providing investment advisory services and such services do not involve a securities transaction that is to be completed through the Registered Representative or Registered Representative Company, coverage shall not be afforded by this policy for such activities unless the Registered Representative, prior to such services, provides written notice to the Broker/Dealer.

(*Insurance Policy* [Doc. 40-5] 37-38.) The policy defines "Wrongful Act" as "any act, error or omission by (1) Broker/Dealer, or by any director, officer, partner or employee thereof in their respective capacities as such, or (2) by any Registered Representative or Registered

Representative Company." (*Id.* 37.) The policy defines "Professional Services" as follows:

> (k) "Professional Services" mean the following services if rendered in connection with an Approved Activity for or on behalf of a customer or client of the Broker/Dealer pursuant to a written agreement between the Broker/Dealer and the customer or client:
>
> (1) purchase or sale of securities, including investment companies,
>
> (2) purchase or sale of annuities or variable annuities,
>
> (3) purchase of [sic] sale of life or accident and health insurance,
>
> (4) providing brokerage services for individual retirement accounts (IRAs), Keogh retirement plans and employee benefit plans (other than multiple employer or multiemployer welfare arrangements),
>
> (5) services performed as a registered investment adviser;
>
> and in connection with or incidental to any of the foregoing 5 activities
>
> (6) providing economic advice, financial advice or investment advisory [services], or
>
> (7) providing financial planning advice including without limitation any of the following activities in conjunction therewith: the preparation of a financial plan or personal financial statements, the giving of advice relating to personal risk management, insurance, savings, investments, retirement planning or tax.

(*Id.* 36.) An "Approved Activity" is defined as follows:

> (a) "Approved Activity" means a service or activity performed by the Registered Representative on behalf of the Broker/Dealer which:
>
> (1) has been approved by the Broker/Dealer to be performed by the Registered Representative, and is
>
> (2) in connection with the purchase or sale of a specific security, annuity or insurance product which has been approved by the Broker/Dealer to be transacted through the Registered Representative, and for which
>
> (3) the Registered Representative has obtained all licenses required by the

Broker/Dealer or applicable law or regulation.

(*Id.* 9.) The policy also includes a number of exclusions from coverage, including the following:

**4. EXCLUSIONS**

The Insurer shall not be liable for Loss in connection with any Claim amde against an Insured:

. . .

(r) with respect to coverage provided under Coverage B only, alleging, arising out of, based upon or attributable to any activity of, or services provided by, the Registered Representative other than a covered Professional Services, including but not limited to "selling away"'

(*Id.* 15.) Under the policy, Chartis has a "duty to defend":

The Insurer shall have the right and duty to defend, subject to and as part of the Limits of Liability, any Claim made against an Insured during the Policy Period or Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act for which coverage is afforded by this policy, even if any of the allegations of the Claim are groundless, false or fraudulent.

(*Id.*7.)

**B.     THE INSURANCE CLAIMS**

The instant dispute over coverage under the policy stems from a lawsuit filed by Samuel Robinson against Isaacs and Nexus for negligence and breach of fiduciary duty ("underlying complaint"). On April 11, 2011, Robinson filed the underlying suit, alleging in relevant part as follows:

8. In or about 2003, plaintiff attended a legal and tax seminar designed to promote the professional services and specialized qualifications of J. Douglass Jennings, APC., in areas of taxation, corporate law, retirement planning, estate planning and real estate planning. Shortly thereafter, plaintiff retained Jennings to perform legal and accounting services on his behalf.
9. In or about April 2005, Jennings learned that plaintiff had received an inheritance of approximately $3 million dollars from his mother's estate. Almost immediately thereafter, Jennings introduced plaintiff defendant ISAACS, who was described as an "independent financial adviser."
10. ISAACS and Jennings have known each other since the 1970s. Jennings

described them as "very good friends." . . . the precise nature of this personal relationship, and its potential and actual effect on the so-called "independent" financial advice and recommendations ISAACS and NEXUS provided with respect to plaintiff's investments in companies owned and/or operated by Jennings, were never disclosed.

. . .

12. On May 11, 2005, ISAACS, Jennings and plaintiff had a conference . . . to review, analyze and discuss plaintiff's estate planning, tax, corporate and investment strategies.

13. On May 12, 2005, ISAACS, Jennings and plaintiff met . . . to discuss advanced estate planning and investment issues.

14. On May 13, 2005, ISAACS, Jennings and plaintiff met . . . to review, analyze and coordinate plaintiff's estate planning, tax, corporate and partnership matters, discuss advanced tax planning and investment planning strategies, and discuss subscription agreements and investments in companies owned and/or operated by Jennings, La Jolla Equities Income Fund I and Investments of Jackson Hole, LLC.

15. During the May 13, 2005, meeting, Jennings purportedly discussed various conflicts of interest crated by the planned investment strategies in La Jolla Equities Income Fund I and Investments of Jackson Hole, LLC., and confirmed that plaintiff "is relying upon independent financial advice, as [Jennings] has a conflict of interest." Based upon the representations of Jennings and ISAACS, and ISAACS' active participation in the meetings, plaintiff understood that ISAACS, through NEXUS, was acting as the aforementioned "independent" fiancial adviser, and had assumed all of the obligations of reasonable care and good faith attendant thereto.

16. Based upon defendants' "independent" financial advice and recommendations, on May 18, 2005, plaintiff invested $500,000.00 in La Jolla Equities Income Fund I, a business entity over which Jennings exerted complete control.

. . .

17. Based upon defendants' "independent" financial advice and recommendations, on March 3, 2008, plaintiff invested $60,000.00 in La Jolla Equities Income Fund I.

. . .

18. . . . La Jolla Equities Income Fund I was merely Jennings' private "piggy bank" used to fund, among other things, extravagant family vacations and lavish personal business expenses. All of the funds invested by plaintiff in La Jolla Income Fund I have been squandered.

19. Based upon the defendants' "independent" financial advice and recommendations, on May 16, 2005, plaintiff invested $500,000.00 Investments of Jackson Hole, LLC, a company formed by Jennings to acquire parcels of real property in Teton County, Jackson Hole, Wyoming. .

. For all intents and purposes, Investments of Jackson Hole is the alter-ego of Jennings.

20. Plaintiff . . . failed [sic] receive a full and adequate disclosure of the actual and likely conflicts of interest created by doing business with Jennings . . . Plaintiff also failed to receive full and adequate disclosure of the actual and potential risks of the investment.

. . .

22. Most, if not all, of the parcels acquired by Investments of Jackson Hole, LLC., are in the process of foreclosure or have been foreclosed upon, resulting in the loss of plaintiff's investment.

. . .

24. Since May 2005, and continuously thereafter, a business relationship existed between plaintiff and defendants ISAACS and NEXUS. At all times during the existence of the business relationship, with the full knowledge of ISAACS and NEXUS, plaintiff relied completely upon their skills and abilities to provide competent and accurate financial advice and services related to his estate plan, including his investments in La Jolla Income Fund I and Investments of Jackson Hole, LLC.

25. As a result of the business relationship between plaintiff and defendants ISAACS and NEXUS, defendants had a duty to provide plaintiff with independent financial advice and services with the reasonable care, skill, and diligence possessed and exercised by ordinary financial advisors in similar circumstances.

26. At all times relevant here, defendants, and each of them, failed to exercise reasonable care and skill in undertaking to provide independent financial advice and services on behalf of plaintiff by negligently, carelessly, and recklessly failing to advise and otherwise disclose to plaintiff that the investments were needlessly risky and inappropriate for a man of plaintiff's age and financial needs.

27. At all times relevant here, defendants, and each of them, failed to exercise reasonable care and skill in undertaking to provide independent financial advice and services on behalf of plaintiff by negligently, carelessly, and recklessly engaging in or instructing plaintiff to engage in transactions that were detrimental and adverse to plaintiff's estate plan and financial health.

28. At all times relevant here, defendants, and each of them, failed to exercise reasonable care and skill in undertaking to provide independent financial advice and services on behalf of plaintiff by negligently, carelessly, and recklessly failing to provide plaintiff with adequate information, analysis, and evaluations regarding the investments and their effect on his estate plan, and financial health, and by failed to ensure that the transactions were as stated, fully documented and completely explained.

. . .

32. Defendants ISAACS and NEXUS, and each of them, breached their

> fiduciary duties to plaintiff by engaging in the acts and omissions herein-
> above alleged in this Complaint.

(*JSUF* ¶ 5; *Underlying Complaint* [Doc. 40-7] Ex. 2, ¶¶ 8-10, 12-20, 22, 24-28, 32.) On April 13, 2011, Geneos timely reported the underlying complaint to Chartis. (*JSUF* ¶ 6.) On April 19, 2011, Chartis acknowledged receipt of this correspondence. (*Letter Acknowledging Receipt* [Doc. 40-7] Ex. 3, 2.) The parties did not correspond again until October 26, 2011, when Chartis sent a letter to Isaacs denying coverage under the policy. (*October 26, 2011 Letter Denying Coverage* [Doc. 40-7] Ex. 4.)

Next, the underlying action was removed to the United States District Court for the Southern District of California, the Honorable Janis L. Sammartino presiding. (*ISUF* ¶ 7.) Then, on October 12, 2011, the district court granted Isaacs and Nexus's motion to compel arbitration and stayed the proceedings pending the completion of arbitration. (*Order Granting Mot. to Compel Arb.* [Doc. 40-7] Ex. 6.)

Shortly thereafter, on October 26, 2011, Chartis sent the aforementioned denial letter to Isaacs. The letter laid out Chartis's rationale for denying coverage:

> Samuel Robinson alleges that you encouraged him to invest in two investments, La Jolla Equities Income Fund I and Jackson Hole, LLC. Mr. Robinson alleges that the investments were unsuitable and that he has suffered and will continue to suffer monetary damages. The Policy provides coverage to Registered Representatives for alleged wrongful acts committed in the rendering or failing to render a Professional Service on behalf of the Broker/Dealer. La Jolla Equities Income Fund I and Jackson Hole, LLC are not investments approved by Geneos Wealth Managmenet; therefore there is no coverage for you, Craig Isaacs, or your company Nexus Wealth Management, Inc. under the Policy. Please refer to Definitions 2A–(Approved Activity)–amended in Endorsement 11, 2k- Professional Services and Insuring Agreements (1B) of the Policy, which are applicable.
>
> Please refer to Exclusion (4f) of the Policy, which may be applicable. Exclusion (4r) excludes coverage for claims arising from any activity provided by a Registered Representative other than a covered Professional Service. Also, the Plaintiff is seeking punitive damages in his complaint. Under the Policy, the Definition of Loss (2i) does not include punitive damages.

((*October 26, 2011 Letter Denying Coverage* 2.)

On November 8, 2011, Isaacs responded to the letter denying coverage with his own letter explaining why he believed he was entitled to coverage. (*Isaacs' Response to Chartis's Denial* [Doc. 40-7] Ex. 5.)  In his response, Isaacs objected to Chartis's summary of the lawsuit as insufficient, arguing that the "factual allegations of the complaint clearly include claims for misfeasance that go well beyond your abbreviated summary of the complaint." (*Id.* 2.)  First, he argued that Chartis failed to identify that a continuous business relationship existed between Isaacs, Nexus, and Mr. Robinson  (*Id.*)  Second, he argued that Mr. Robinson is suing for professional services that go beyond the two investments in La Jolla Equities Income Fund I ("La Jolla Equities") and Investments of Jackson Hole, LLC ("Jackson Hole"). (*Id.*)  Third, he suggested that, contrary to Chartis's position, Geneos did approve Isaac and Nexus' professional services rendered apart from those services rendered with respect to La Jolla Equities and Jackson Hole. (*Id.* 3.)  In further support of his position, Isaacs enclosed three documents with his letter: (1) an Advisory Services Contract between Mr. Robinson, Geneos, and Isaacs, dated September 28, 2006, (2) an Investment Review prepared for Mr. Robinson by Isaacs on April 5, 2009, and (3) an copy of the October 12, 2011 order in the underlying case granting Isaacs' motion to compel and staying the lawsuit pending arbitration  (*JSUF* ¶ 11.)

On December 1, 2011, after receiving no response to his November 8 letter, Isaacs sent a letter to Chartis. (*JSUF* ¶ 12.)  This letter again demanded that Chartis "fully cooperate in the defense of [the underlying lawsuit]" and enclosed invoices totaling over $56,000 for costs incurred by Isaacs and Nexus in connection to the underlying suit. (*Id.; Isaacs' December 1, 2011 Letter* [Doc. 40-8] Ex. 9, 2.)

On December 14, 2011, after the underlying action was stayed, "Robinson filed a Statement of Claim with the Financial Industry Regulatory Authority ("FINRA") thereby commencing an aribtration proceeding against Isaacs, Nexus and Geneos" (the "FINRA Arbitration). (*JSUF* ¶ 13.)  The claims made by Robinson in the FINRA Arbitration were essentially the same as those alleged in the underlying complaint. (*Pls.' Mot. Summ. J.* 8; *Def.'s Mot. Summ. J.* 10; *See FINRA Statement of Claim* [Doc. 40-8 ] Ex. 11.)  On December 20, 2011, Isaacs reported the FINRA Arbitration to Chartis, and demanded that Chartis defend and

indemnify Isaacs and Nexus against the FINRA claims and requested a response to his November 8, 2011 letter. (*JSUF* ¶ 14; *Letter Notifying Chartis of FINRA Arbitration* [Doc. 40-8] Ex. 11, 1.) On December 23, 2011, Chartis acknowledged receipt of the Statement of Claim. (*JSUF* ¶ 15.) On January 23, 2012, Isaacs sent a letter to Chartis, again arguing that Chartis had a duty to defend Isaacs and Nexus in connection with all of Robinson's claims. (*JSUF* ¶ 16; *Isaac's January 23, 2012 Letter to Chartis* [Doc. 40-8] Ex. 13, 1.) On January 24, 2012, Isaacs followed up with an email to Chartis. (*January 23, 2012 Email to Chartis* [Doc. 40-8] Ex. 14.)

On February 6, 2012, Chartis sent another denial letter to Isaacs. (*JSUF* ¶ 17.) The letter reiterated Chartis's position that they were not obligated to cover Isaacs and Nexus for the underlying claims:

> [T]he coverage promise for the Registered Representatives clearly and unambiguously limits coverage to wrongful acts "in the rendering or failure to render Professional Services on behalf of the Broker/Dealer." The policy defines "Professional Services" to required that the service be rendered "in connection with an Approved Activity." Approved Activities must be "in connection with the purchase or sale of a specific security, annuity or insurance product which has been approved by the Broker/Dealer to be transacted through the Registered Representative."
>
> Neither La Jolla Equities Fund I, nor Jackson Hole, LLC are approved products. . . . Since neither La Jolla Equities Fund I, nor Jackson Hole, LLC are approved products, Mr. Isaacs' investment advice to Mr. Robinson is not covered by the policy.

(*Chartis's February 6, 2012 Denying Coverage* [Doc. 40-9] Ex. 15, 4-5.) The letter also repeated that the claims were also subject to Exclusion 4(r). (*Id.* 5.) The letter did not mention whether or not it would cover Isaacs and Nexus with respect to the FINRA Arbitration. (*See id.*)

On March 23, 2012, Isaacs was served with an Amended Statement of Claim in the FINRA Arbitration. (*JSUF* ¶ 18.) The Amended State of Claim added additional claims, including allegations regarding two additional investments made by Robinson, which were both Geneos-approved securities. (*Amended FINRA Statement of Claim* [Doc. 40-8] Ex. 16, 5.) On March 28, 2012, Isaacs forwarded the Amended Statement of Claim to Chartis. (*JSUF* ¶ 19.) On April 27, 2012, and then again on May 18, 2012, Isaacs sent two follow-up letters to Chartis.

On June 12, 2012, Chartis sent a letter to Isaacs accepting the defense of the Amended Statement of Claim, as of March 28, 2012, the date the new claims were tendered to Chartis.  (*Chartis's June 12, 2012 Letter Accepting Defense of Amended FINRA Statement of Claim* [Doc. 40-11] Ex. 20, 1.)

On February 10, 2012, Isaacs and Nexus filed the instant Complaint, alleging (1) breach of contract and (2) breach of implied covenant of good faith and fair dealing and requesting declaratory relief.  (*Compl.* [Doc. 1].)  On March 7, 2012, Chartis filed a motion to dismiss.  (*MTD* [Doc. 4].)  On May 10, 2012, the Court granted the parties' joint motion, which stayed the case pending non-binding mediation and dismissed the pending motion to dismiss.  (*Joint Motion* [Doc. 10]; *May 10, 2012 Order* [Doc. 12].)  On January 24, 2012, after unsuccessful mediation, the Court lifted the stay.  (*Order Lifting Stay* [Doc. 25].)

On June 25, 2013, Isaacs filed the instant motion for partial summary judgment.  (*Pls.' Mot. Summ. J.*)  On July 29, 2013, Chartis filed a cross-motion for summary judgment and opposition to Isaacs' motion.  (*Def.'s Mot. Summ. J.*)  Both motions are fully briefed.  Essentially, the parties dispute whether or not Chartis breached its contractual duty to defend Isaacs and Nexus with respect to the underlying complaint and the original FINRA Statement of Claim.  Isaacs and Nexus contend that Robinson's claims should have been defended under the Policy, and Chartis claims that the claims were outside the policy and otherwise excluded from coverage.

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 242, 252). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the

underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

### A. Did Chartis have a duty to defend against the underlying complaint?

There is no dispute that a portion of the underlying complaint addresses Plaintiffs' actions with respect to the La Jolla Income and Jackson Hole investments, which were not Geneos approved securities. And there is no dispute that these claims are not covered by the Policy. Instead, the parties disagree as to the scope of the underlying complaint and whether it triggered Chartis' duty to defend. Plaintiffs contend that "the allegations of the original complaint were sufficiently broad to trigger Chartis' duty to defend." (*Pls.' Mot. Summ. J.* 12.) They also suggest that Chartis interpreted the complaint far too narrowly. (*Id.* 13.) Chartis's position is that "the Underlying Complaint only alleges claims against Isaacs/Nexus arising from the La Jolla Equitites Income Fund I and Jackson Hole LLC investments" and "did not allege any facts whatsoever regrading any other investments by Robinson." (*Def.'s Mot. Summ. J.* 17.) The Court agrees with Plaintiffs.

Under California law, in order to trigger an insurer's duty to defend, "the insured need only show that the underlying claim *may* fall within policy coverage." *Montrose Chemical Corp. v. Superior Court*, 6 Cal. 4th 287, 300 (1993) (emphasis in original). "[T]he insurer must prove it '*cannot*.'" *Id.* (emphasis in original). This is so even if a claim is "insubstantial" and would not support an award of damages. *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1086 (1993), *as modified on denial of reh'g*, (May 13, 1993). "Once the defense duty attaches, the insurer is obligated to defend against all of the claims involved in the action, both covered and uncovered, until the insurer produces undeniable evidence supporting an allocation of a specific portion of the defense costs to a non-covered claim." *Id.* at 1081. The duty arises as soon as

tender is made, and is discharged when the action is concluded. *Montrose Chemical*, 6 Cal.4th at 295. It may be extinguished earlier, if it is shown that no claim can in fact be covered. *Id.*

To protect an insured's right to call on the insurer's "superior resources for the defense of third party claims ... California courts have been consistently solicitous of insureds' expectations on this score." *Montrose Chemical*, 6 Cal. 4th at 295-96. Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor. *Id*. at 299-300

The determination whether the insurer owes a duty to defend is usually made in the first instance by comparing the allegations of the complaint with the terms of the policy. *See Montrose Chemical*, 4 Cal. 4th at 295. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. *Id*. Furthermore, an insurer must undertake a reasonable investigation into the circumstances of the claim before denying coverage. *Am. Int'l Bank v. Fidelity and Deposit Co.*, 49 Cal. App. 4th 1558, 1571 (1996).

### 1. Robinson's claims in the underlying complaint are not limited to allegations arising from La Jolla Income and Jackson Hole.

In the underlying complaint, Robinson alleged that he relied upon Plaintiffs "to provide competent and accurate financial advice and services related to his estate plan, including his investments in La Jolla Income Fund I and Investments of Jackson Hole, LLC." (*Underlying Complaint* ¶ 24.) A plain reading of these allegations shows that Robinson's claims go beyond the La Jolla Income and Jackson Hole investments. By saying that his claims "include" these investments, it necessarily implies that Robinson's claims were not limited to those specific investments. He goes on to allege that Plaintiffs breached their duties of reasonable care to provide financial advice, without mentioning any specific investments. (*Id.* ¶¶ 25 - 28.) Thus, from even a cursory review of the underlying complaint, it is clear that Robinson's allegations are not limited only to Plaintiffs' actions regarding the La Jolla Income and Jackson Hole investments. Therefore, Chartis's argument that the underlying complaint "only alleges claims . . . arising from the La Jolla Equities Income Fund I and Jackson Hole LLC investments" fails.

The Court must now determine if Robinson's claims unrelated to these specific investments triggered Chartis's duty to defend.

### 2. Robinson's claims unrelated to La Jolla Income and Jackson Hole triggered Chartis's duty to defend.

The Policy covered claims against Plaintiffs for "any actual or alleged Wrongful Act committed by the Registered Representative in the rendering or failure to render Professional Services" on behalf of Geneos. (*Insurance Policy* 37.) "Professional Services" include, *inter alia*, the provision of "economic advice, financial advice or investment advisory [services]" as long as the following conditions were met: these services were given " in connection with or incidental to" the "(1) purchase or sale of securities, including investment companies, (2) purchase or sale of annuities or variable annuities,. . .(5) services performed as a registered investment adviser" *and* "in connection with an Approved Activity." (*Id.* 36.) An "Approved Activity" must be "in connection with the purchase or sale of a specific security, annuity or insurance product which has been approved by the Broker/Dealer to be transacted through the Registered Representative." (*Id.* 9.)

The coverage framework explained above is a bit convoluted, but can be broken down into manageable parts.  First, a claim under the Policy is covered if the Registered Representative is alleged to have committed a "Wrongful Act."  There is no dispute that the underlying complaint alleged that Plaintiffs, who were Registered Representatives, committed various "Wrongful Acts." (*See Insurance Policy* 37; *Underlying Complaint* ¶¶ 24-28, 32.)

Second, the "Wrongful Act" must be committed while rendering, or failing to render, "Professional Services."  To qualify as "Professional Services," the alleged wrongful acts must meet a number of requirements.  The "Professional Services" must be "economic advice, financial advice, or investment advisory [services]" and rendered "in connection or incidental to "the purchase or sale of securities, including investment companies."  The underlying complaint explicitly alleges that Plaintiffs provided what amounts to "economic advice, financial advice, or investment advisory [services]" to Robinson, including "financial advice and services."

(*Underlying Complaint* ¶¶ 24, 25, 26, 27, 28.)   It is also clear from the underlying complaint that these services were rendered in connection with the "purchase or sale of securities, including investment companies." (*Id.*)

Third, and finally, these "Professional Services" must be "in connection with an Approved Activity" to trigger a duty to defend.  This last requirement is where the battle lines have been drawn in this case.  It is true, as Defendants repeatedly proclaim, that the underlying complaint does not explicitly mention any Geneos-approved investments. (Defs.' Mot. Summ. J. 16-17; Defs.' Reply [Doc. 48] 2.)  Defendants essentially argue that because Plaintiffs cannot point to any explicit mention of Geneos-approved investments in the underlying complaint, Defendants had no duty to defend.  This narrow and incomplete line of argument parallels Defendants equally restricted and inadequate interpretation of the underlying complaint and the Policy.

Plaintiffs do not need to explicitly plead that Geneos-approved investments were the subject of the "Professional Services" rendered.  Instead, they need only present extrinsic evidence that demonstrates the "that the underlying claim *may* fall within policy coverage." *Montrose Chemical Corp.*, 6 Cal. 4th at 300.  By showing that Defendants were aware of Robinson's broad allegations of misconduct by Plaintiffs, who were working with and for Geneos at the time of the allegations, Plaintiffs have met this burden.  These allegations were enough to put Chartis on notice that Robinson could potentially seek damages for Plaintiffs conduct in connection with approved Geneos investments, especially in light of the fact that Plaintiffs had indeed sold Robinson Geneos approved investments which were subject to the underlying complaint. (*Isaacs Decl.* [Doc. 40-3] ¶ 5-11, 15.)  Once put on notice, the burden shifted to Chartis, and it was not sufficient for Chartis to respond by saying that it had no duty to defend based on the narrow reasoning that La Jolla Income and Jackson Hole were not Geneos-approved. *See id.* (holding that once insured shows that duty to defend may apply, insurer may only refuse to defend if it can prove that the duty to defend cannot apply).  Instead, under California law, Chartis should have investigated Robinson's broad allegations of misconduct in

order to establish that the duty to defend could not apply. *See Safeco Ins. Co. Of America v. Parks*, 170 Cal. App. 4th 992, 1003 (2009) ("[A]n insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." [citations omitted]); *see also Jordan v. Allstate Ins. Co*, 148 Cal. App. 4th 1062, 1074-75 (2007) ("An insurance company may not ignore evidence which supports coverage. If it does so, it acts unreasonably towards its insured and breaches the covenant of good faith and fair dealing."); *Shade Foods, Inc. v. Innovative Products Sales Marketing, Inc.*,78 Cal.App.4th 847, 882 (2000) (the record "suggests that [the insurer] looked the other way when confronted with facts revealing the possibility of first party coverage, resisting both reasonable interpretation of policy language and a compelling history of negotiation to secure this coverage"); *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1163 (9th Cir. 2002) (even assuming the insurer's interpretation of its policy was not adopted in bad faith, its failure to investigate the facts surrounding the claim was evidence of bad faith.) There is no evidence in the record that Chartis did any investigation into Robinson's claims. Instead, Chartis simply, and improperly, denied Plaintiffs claims because they did not explicitly mention a Geneos-approved security.

In light of the foregoing, the Court finds that the underlying complaint triggered Chartis's duty to defend, and that Chartis breached its contractual duties to the Plaintiffs.[1] Therefore, the Court **GRANTS** Plaintiffs motion for partial summary judgment and **DENIES** Defendants motion for summary judgment.[2] Because the Court finds that the duty to defend was triggered by the underlying complaint, the Court also finds that Chartis had a duty to defend against the original FINRA Statement of Claim as the parties agree that the allegations therein are essentially the same as those in the underlying complaint.

---

[1] Defendants also argue that they are shielded from liability under Exclusion r. (*Defs.' Mot. Summ. J.* 20.) This is essentially a restatement of their main argument, and fails for the same reasons as outlined above.

[2] Defendants also move for summary judgment on Plaintiffs' bad faith claims. (*Defs.' Mot. Summ. J.* 23.) This entire argument depends on Plaintiffs' breach of contract claims being denied. Since they have not been, the Court **DENIES** Defendants' motion on this ground as well.

## IV. CONCLUSION & ORDER

In light of the foregoing, the Court **GRANTS** Plaintiff's motion for partial summary judgment and **DENIES** Defendants motion for summary judgment.

**IT IS SO ORDERED.**

DATED: March 31, 2014

_____

M. James Lorenz

United States District Court Judge